May it please the Court, my name is Ted Sumner and I represent Mr. Shea in this matter. Way off. Yes, Your Honor, it took me a while to figure it out myself. With the leave of the Court, I'd like to reserve five minutes of my time for rebuttal. Your Honor, this case is best understood if I start with a brief recitation of some of the key critical facts that led up to the incident that we're going to be ultimately talking about. In 1984, Mr. Shea came to the United States on a student visa. He's 6'11", he had aspirations of being a professional basketball player. He never quite made it, but that was what his goal was. So he played for the University of Oregon, he finished his collegiate career, and then he went to adjust his status with immigration so that he could continue to pursue a professional basketball career. Unfortunately, immigration lost some of his applications, and so while he was working on adjusting his status to be the proper status as a professional athlete, he was also working in basketball in a group called Athletes in Action. And he'd travel around with his basketball group trying to prevent at-risk kids from joining gangs. This basketball group had a trip planned to go to Canada. So he was concerned because his status was unclear with these lost applications. So he goes to some friends in immigration in the late 80s or 1990, and he says, am I going to have a problem? And they said, well, you might. So what can we do about it? So they do a backroom deal and they issue advance parole documents. We've learned much later down the road during the pendency of this case that those documents were improperly issued. So Mr. Shea goes to Canada with the knowledge that if he comes back to the United States, he has these documents if there's a problem when he crosses the border. He goes for less than a week. He does his thing. He comes back to the border. He comes back into the United States. 1991 comes along, and immigration decides, for whatever reason, that they are going to deport Mr. Shea from the United States. So they start deportation proceedings in the spring of 1991. Somewhere in the summer of 1991, one of the attorneys for immigration says, oh, well, look in his file. We have these parole documents. So they terminated the deportation proceedings. They revoked the parole in writing. That's a critical fact. They revoked the parole in writing, and they instituted exclusion proceedings. As he went through the exclusion proceedings, he lost at the immigration lodges level. He lost at the BIA in 1999. And he applied to this court for review of his whole immigration case. In May of 1999, this court denied his initial request for stay of removal or stay of deportation. It turns out his lawyers had done it on the wrong form. So they immediately resubmitted the application on May, I believe, 27th of 99. During this entire time, this entire battle, Mr. Shea is working in the United States. He's pursuing his life, and he's free to do whatever he wants. He checks in as INS has required. He follows all of the things that they ask him to do during this procedure or during this whole time period, but he's working. He's living in the United States pursuing his legal right to review the decisions of the immigration law judge and the Board of Immigration Appeals. So on August 25th, the morning of August 25th, this court issues a stay of deportation. It says, you know what, Mr. Shea? Your appeal has enough merit that we're going to say, immigration, you can't remove him. That afternoon, immigration arrests Mr. Shea, and they say... Are they aware of the stay, though, at that point? That's a disputed fact about whether they're aware of the stay at that point, Your Honor. There's a factual question. What's undisputed is the next morning, the morning of the 26th, that immigration, the actual arresting officer in immigration, knew absolutely the next morning. I believe it's 7, 8 o'clock in the morning. It's in the record on the fax notation, but the exact time is not important. Is your argument that the stay of deportation negated the ability to detain the client? Your Honor, that goes to the critical piece about parole revoked in writing. The regulations in the U.S. Supreme Court in 1985, so well established when we come to this case in 1999, that an alien who has had his parole revoked in writing shall be released, shall be released, unless the district director finds that the public interest requires his continued detention. Okay. What's regulation 8 citing? That is, let me find it here on my notes, that's 8 CFR 212.5. And the U.S. Supreme Court in 1985 looked at that regulation in relation to the Haitians, or not the Haitians, the Cubans, in the Muriel Boatlift in the late 70s and early 80s, and looked at the regulation and said, you have to do an individual determination alien by alien about how this regulation applies. Did the immigration officials agree with you regarding the condition under which he was arrested? Did they say it was pursuant to a revocation, or what procedure were they following? Yeah, sure. And that's a good question. They claimed that Mr. Shea was in his removal period, which is a term of art defined by statute. Okay. Now, under the statute, when an alien is in the removal period, there's mandatory detention. So your argument was that he was in a revocation mode, and their argument was he was in a removal mode. Yes, Your Honor. Let me explain why the government is wrong in their argument. The statute says that the removal procedure begins at the latter of one of three times.  It was in this case. The Board of Immigration Appeals had done its thing. It was administratively final. Or number two, and important in this case, if a reviewing court issues a stay of proceeding, then the removal period begins when that court issues its final decision. Okay. This court had issued a stay. It had not issued its final decision, and so he was not in the removal period. Okay. And then the third point is unimportant, is if a criminal alien is in detention for the criminal matter, it begins when that's over. That doesn't apply to this case. You had a question, Your Honor? Well, removal period, you said until the Ninth Circuit issued its final decision. After it issues a stay. Okay. So when the Ninth Circuit – it's not the appeal. It's the issuance of a stay. Now, this case – What case authority are you relying upon for that proposition? It's the statute. It's the statutory language. What statute? And that is 8 U.S.C. 123-1-A-1, and I believe it's B, Your Honor. 1231? 1231, yes, Your Honor. 1231.1? Yes, Your Honor. 1231.1? Oh, A-1-B. A-1-b. Upper B. Lower A, upper B. So are you arguing that the officers that arrested him made a legal mistake? Yes, Your Honor. But is it a legal mistake that no reasonable person could make, no reasonable officer could make, given the complexities of the immigration law that you're here to explain to us? It took you several minutes to explain, so how about that? Was it unreasonable for them to act under the warrant in the belief that he was in the removal period? Well, Your Honor, no, it's not unreasonable. In the revocation mode, I'm sorry. Your Honor, it's not unreasonable, and that's a good question. But that's critical, isn't it, to qualified immunity? Well, to qualified immunity it is, Your Honor. That's an important – well, actually, no, it's not. Not the complexity of the law, excuse me. The issue is whether the law is clearly established, not whether the individual officer knows it. That's subjective. And this is what a reasonable officer would do. And the complexity of the law isn't the question. Is the law established? Suppose it's established. Yes, Your Honor. That leaves the question whether a reasonable person, officer, could be mistaken in interpreting it. Well, Your Honor, let's look at what immigration actually does when they send their officers out to enforce the law. And we discussed this in depositions, and I'm not sure if it's clearly in the record before this Court. But in depositions that established that the individual immigration officers are given a copy of the statute and a copy of the regulations go to it. In our discovery request, we asked for copies of the manual saying, how do you apply this? And they said they don't exist. So immigration and the U.S. government has decided that the law is sufficiently clear and the regulations are sufficiently clear that their own officers can apply them. Counsel, let me ask you this. Can we go back to 8 CFR 212.5? Yes, Your Honor. Does that regulation apply in the absence of threatened removal to a country that won't take the alien back? I thought that was limited to certain countries. The regulation that I cited, Your Honor, is dealing – the context where the regulation came from will help explain how it should be applied. But just the language of the regulation, your understanding of the language. Doesn't it apply to certain situations? It applies to an alien who is detained after their parole has been revoked in writing. And it's not limited to countries that will not take the alien? No, Your Honor. No, Your Honor. And that's an important distinction because the regulation – the historical basis of the regulation was the fact that there were too many Cubans for INS to properly evaluate. And so what they did is they imprisoned everybody. And then the court said, no, you can't do that. Then they created this regulation saying, okay, we have to look at everybody individually. So what do you say about the effect of the Barrera-Echevarria case? I'm sorry? What do you say about the effect of Barrera-Echevarria on your argument? Well, Your Honor, that's distinguishable for three very important reasons. And the most important reason is in that case he got his individualized determination on eligibility for parole. He got the procedure. And the crux of our argument is Mr. Sheehan was entitled to the procedure and didn't get it. I mean, that's the key difference. You know, the other difference, another of the three differences, is that in Barrera, it was a criminal alien who was clearly in his removal period. I mean, here we have an alien who's not in the removal period, who's not given the procedures and afforded him by statute and by regulation and by U.S. Supreme Court case law. You know, it's a different factual situation. You have to look at the status of the prisoner, or not of the prisoner, but of the alien, to make a determination about whether or not INS is handling him properly or her properly. It's the status in Barrera, a criminal alien in the removal period when no one would take him. Mr. Shea, a non-final order of removal whose parole has been revoked in writing and who's currently litigating whether he should be in exclusion or in deportation. So those are critical differences. Now, Judge Hogan in the court below, when he ultimately ordered a hearing for Mr. Shea and then ordered him released, okay, and found that the detention was illegal, and he ordered an individualized bond hearing before an immigration law judge within three days, okay, that order was not appealed. Immigration said, well, we're not going to do it before an immigration law judge. We're going to put it before the jailer, before Mr. Selar, who was the deputy director of deportation. And there was no evidence presented on behalf of the government. Mr. Shea brought in lots of character evidence saying, you know, I should be able to be released. Mr. Selar refused to let the order be clarified with Judge Hogan during the hearing to make sure they followed the right procedure. So and then they said, oh, we're going to keep you. Judge Hogan said, no, that violated my order, okay, and ordered Mr. Shea released. Judge Hogan's order was not a model of clarity in terms of how the proceedings should ensue. So there was a little bit of confusion regarding how to proceed and who should conduct the hearing and what it should entail. Your Honor, the written opinion, which the court below relied on, was issued after the hearing, was issued after the three days expired. So that's not a factor in confusion, okay. What we have to look at is what was said to the United States attorneys. About who? About who. And there was confusion by Judge Hogan. And he said before an appropriate authority, and the attorneys kept saying, well, we need some direction here, Your Honor. And so he gave the direction, and it's cited in our briefs and quoted in our briefs. It said before an immigration law judge. You will do it before an immigration law judge. Okay, well, they refused to do that. Now, I anticipate that the government is going to get up here and say, well, Beebe and Szilard didn't know that because they weren't at the hearing, okay. But that is not a valid reason to disobey a judge's order. Every day throughout our country in courts of all different sizes, lawyers come up and advocate for positions for clients who aren't physically in the courtroom. We expect and demand the clients to follow the judge's and the court's rulings regardless of whether they're there. If Beebe and Szilard have a complaint, they have a complaint against their lawyers. The judge's orders to hold the hearing in a certain manner is binding on them. An administrative official has two options when a judge orders to take certain action. One, follow the judge's order, or two, appeal. In this case, they did neither. Now, I'm into the time I'd like to reserve for rebuttal. All right, thank you. Please proceed, counsel. May it please the court, Kelly Zusman, appearing on behalf of the United States and the individual federal defendants. Judge Panner correctly ruled that each of the individual defendants in this case is entitled to qualified immunity as a matter of law. Now, this is a Bivens case, and a Bivens case involves the identification of a constitutional violation. And not only that, the plaintiff has to prove not mere negligence or that a mistake was made, but he has to show deliberate abuse of governmental power rather than mere negligence. That's what this court held in O'Neill v. U. That's at 866 Fed Second 314, 9th Circuit, 1989. Counsel, what was the effect of the disobedience to Judge Hogan's order? Your Honor, there was no disobedience of Judge Hogan's order. In a second supplemental excerpt of record that I hope this court has received that was submitted last week, you have the September 17th minute order that Judge Hogan issued following the hearing that you have the transcript. In that minute order, Judge Hogan directed the defendants to hold an individualized bond hearing before an appropriate authority. And that's precisely what happened here. Now, at the time that Judge Hogan made that order, he also acknowledged that the immigration judge had been asked to review the plaintiff's bond hearing. But didn't Judge Hogan himself conclude that his order was violated? He did in June of 2000. However, if you look at what took place, what he actually told the defendants in September of 1999, it was have a hearing before an appropriate authority. And also, during that hearing, the parties acknowledged, Judge Hogan acknowledged, that at that time the immigration judge had already held he lacked jurisdiction to consider bond because the case was administratively final and the regulation that the immigration judge relied upon was 8 CFR Section 236. So when Judge Hogan ordered the INS to hold an appropriate hearing, they couldn't go back to the immigration judge. The immigration judge had already said... Let me ask you this. If the district director only had parole authority and the ALJ no longer had jurisdiction, then who could give the plaintiff the relief he sought? The reading of Judge Hogan's order... Just answer the question I asked you. Who could give the plaintiff that relief then? If the district director didn't have the authority and the ALJ didn't have jurisdiction, then who could give him that relief? The bond hearing. The district director did have that authority. Judge Hogan acknowledged that it was the district director that had the authority to release the plaintiff at that point. But the bond hearing. Who had the authority to conduct a bond hearing at that point? The bond hearing is a term of art. The only person who had the authority to conduct a bond hearing was an immigration judge. But the immigration judge no longer had jurisdiction, in your view. That's correct. So there was no relief available in terms of the bond hearing. It was impossible to have a bond hearing before a district director. But you see the conundrum that the defendants were facing. So was the plaintiff. The plaintiff had a pending application for parole before district director Beebe at the time that he filed his TRO before Judge Hogan. Does that help in terms of a bond hearing? Not in terms of a bond hearing, but it does help in terms of the plaintiff had an avenue for release. He could seek parole from the district director, and that's precisely what he did. How long would that take? There's no timeline set forth in the statute. He filed his application for a TRO through a 2241 habeas corpus petition eight days after he filed his request for parole before the district director. But someone sitting in custody every day is an eternity. I'm not going to quibble with that. But there's nothing in the statute. What we're talking about here is qualified immunity. There's nothing in the statute or the regulations that told district director Beebe he had to rule on that parole application immediately. And the plaintiff in this case has not alleged that any of the statutes or regulations relied upon were unconstitutional. This request was not for the parole hearing. It was for a bond hearing so he could be released from prison. What he wanted was release from prison. What the defendants could not give him, these defendants with the INS, could not tell immigration judge Bennett you have to hold a bond hearing because he'd already ruled that he lacked jurisdiction. Now, the parole application was still pending before district director Beebe, so that's what they acted upon. Judge Hogan's order, his written order of September 17th, hold a hearing before an appropriate authority. A bond hearing. Hold a bond hearing before an appropriate authority. And he said that order was violated. He found in June of 2000 that that was violated. However, if you look at his written opinion from September 22nd of 1999 at page 2, he acknowledges the immigration judge couldn't have complied with his order. Only the district director had the discretion to consider the plaintiff's release. How did you say the order was violated in order that the plaintiff be released? I'm sorry? Why did he order that the plaintiff be released? He reviewed the district director's decision and he found that it was an abuse of discretion. And that's part of a 2241 habeas corpus petition. And that's the procedural protection is that there is judicial review. And he ultimately disagreed with the conclusions that these defendants reached. However, that still doesn't state a constitutional violation. I thought he said that the defendants violated his previous order to hold a bond hearing. Not in his September 22nd opinion. He did in his June 2000 opinion in which he had granted AJA fees. However, nowhere does he identify a statute, a case, or a regulation that would have put any of these defendants on notice that any of their actions were unconstitutional. They were relying in good faith upon Barrera-Echevarria and Alvarez-Mendez v. Stock. Those two cases held, a petitioner has no constitutional right to immigration parole and therefore no right to be free from detention pending deportation. And Alvarez-Mendez v. Stock held parole decisions are an integral part of the admissions process and excludable aliens cannot challenge such decisions as a matter of constitutional right. I also wanted to address a question that you had raised to the plaintiff's counsel. And that relates to the different statutes that are in play here. Now, in May of 1999, this court had denied a request for stay of deportation At that point, this case was administratively final for removal purposes. And Section 241 of the INA, which is also Section 1231 of 8 United States Code, provided for mandatory detention once the Ninth Circuit denied the stay. Now, District Director Beebe signed the arrest warrant in this case on August 12th of 1999 when that stay of deportation was still denied. And that was the basis for the individual officer's actions. That was why they went out to arrest Mr. Shea. It was solely for the purpose of effectuating his removal. And in fact, Officer Godfrey had plane reservations. But for this court's reconsideration and issuance of a stay on August 25th, 1999, Mr. Shea would have been on a plane on the 31st of August. And he would not have been held in custody. When they found out about the reinstatement of the stay, did they have a constitutional duty to release him? They did not. The only duty they had was to comply with that stay, which is precisely what they did. As soon as they learned of the stay, they canceled the flight reservations. The stay, and it says right in the order, it's a stay of deportation. It does not affect arrest or detention authority. And that's consistent with the statutes. Now, Judge Panner found that, in fact, there was a constitutional violation in this case, but that there was no clearly established law. That decision has been confirmed by this court's recent decision in Wong v. Beebe, which was cited in our 28J letter. The court in that case held the state of the law as applied to excludable aliens in 1999 was unclear. And that holds equally true here as well. Now, Wong v. Beebe involved equal protection claims. This case involves substantive and procedural due process claims, but it holds with equal force. These defendants, these officials with the INS, could not have known about the full scope of constitutional rights afforded excludable aliens at this time. It's even unclear now. This court's decision in Gee v. INS, which followed the Supreme Court in Savitas, which held that the detention cannot be unlimited, was a 2-1 split, with Judge Reimer having a very lengthy dissent in which she believed that excludable aliens could be detained indefinitely. We cannot impose that high a standard on these INS officials looking back at 1999. They relied upon facially valid statutes and regulations. And as Judge Panner noted, officials who rely upon duly enacted statutes or regulations are entitled to qualified immunity as a matter of law. And he was quoting Dittman v. California and Grossman v. City of Portland, both cases from this court. The only exception to that, the only time you can deny qualified immunity to officials who rely upon statutes and regulations is if it's so blatantly unconstitutional. And the two examples that this court gave in Grossman were the Holocaust and My Lie. Counselor, you're cutting into your co-counsel's time. Thank you. If I may briefly just summarize. You have a very good, well-reasoned opinion from Judge Panner in this case. When you lay on top of that Wong v. Beebe, Cotes-Ivan, and also we didn't address the federal tort claim claims, but on the Bramwell decision from this court, Judge Panner was absolutely right, and the judgment of the district court should be affirmed for those reasons. Thank you. Good morning. Robert Beatty Walters for Defendant Yamhill County. May it please the court. The county asks that this court affirm the district court's opinion in granting Yamhill County's motion for summary judgment on all of the claims that plaintiff has brought against it. I do feel somewhat like a lost stepchild with all of these other issues, but these are nevertheless before the court. There are three issues that the plaintiff has presented to the court. They all relate to Mr. Che's conditions of confinement. The first issue, plaintiff claims a civil rights violation due to his initial classification and placement in a K-block cell at Yamhill County. In order for the plaintiff to prevail on this civil rights claim, he must show that this decision to place him in the K-block cell was based on a policy, custom, or practice, or that the county employee violated a constitutional right in adhering to a policy, custom, or practice that was deliberately indifferent. In this case, Mr. Che was the last detainee booked into the Yamhill County Jail on the evening of September the 7th. At the time he was booked into the jail, there was one cell available. A line officer made the decision at that point that Mr. Che was to be placed in the K-block cell, awaiting the opening of another cell. There is no evidence of any policy, practice, or custom that this decision was based upon. There is also no evidence that the line officer who made the decision was, in fact, a policymaking authority, or that the decision was then subsequently ratified by a policymaking authority. The facts of the case show the court that the decision placing Mr. Che in the K-block was not a constitutional violation, it was not deliberate punishment, it was simply the result of the facts as the line officer found them on that day. The plaintiff has not shown this court, or the district court below, that the actions in placing him in this segregation block were, in fact, a violation of his constitutional rights. The next claim that the plaintiff makes relates to his classification, security classification. Yamhill County uses an algorithm for assigning security risks. In that algorithm, if an inmate, whether they be a pretrial detainee or an INS detainee, has a hold, they are automatically classified as a medium security risk. This does not mean that the detainee can't be placed in the general population. What Mr. Che has asked this court to do is to find that as a matter of constitutional privilege, an INS detainee who has no criminal history be classified, regardless of the institution's plan for segregation or administration of the jail, as minimum security. He's requesting this court find, as a constitutional matter, that he's entitled to be classified as a minimum security individual, or any other INS detainee who has no criminal history. That is precisely the kind of discretion that the Supreme Court has said should be left to the administrative officials within the jail. The last issue relates to Mr. Che's nutritional status. This is a claim that essentially requires the plaintiff to show that he was denied a serious medical need by his doctor. This is due to the deliberate indifference of the jail staff. In this case, the facts are that the jail staff addressed his needs. The jail doctor reviewed Mr. Che's record and said to the jail nurse, based on what's happening today, there's no reason Mr. Che should have additional caloric intake. The jail doctor ordered that his weight be monitored to make sure that there wasn't an issue with regard to his nutritional status. And then the jail sergeant went beyond that, recognizing that Mr. Che felt he needed additional calories, even though the jail doctor said he didn't. He took affirmative steps to try to get Mr. Che a job in the jail kitchen, which would allow him additional opportunity to obtain whatever food he felt he needed. Unfortunately, Mr. Che was released prior to the institution of that policy, but the jail has since changed its policy in conjunction with the commander and the INS to allow INS detainees to work in the jail kitchen. The point is that there's simply no evidence at all in this record that Mr. Che's rights were violated due to the deliberate indifference of any individual. In fact, the jail staff went out of their way to assist Mr. Che when it was not medically necessary to do so. If there are questions, I'll sum up. Thank you, Your Honor. I'd like to focus with Yamhill County, but I want to point out one thing about the case that I didn't allude to in my primary argument. It's that even if there's qualified immunity, the United States is still liable under the Federal Tort Claims Act for the acts of its officers illegally detaining Mr. Che. And that's an important point to remember. Now, with Yamhill County, what we're really looking at here are distinctions between Eighth Amendment and Fourteenth Amendment permissible treatment. And it's a distinction between a convicted prisoner and a pretrial detainee or a non-convicted prisoner. Counsel, could we go back to that statement you made? You said that under Bivens, the United States is still liable? No, Your Honor. I'm talking about for the imprisonment. Okay. So I don't understand that argument. I thought that the only way the government could be liable is if individuals are liable. So you're saying the United States can be liable in the absence of a claim, a valid claim against individuals? There's a distinction between Bivens, which is a constitutional base, and a tort claim, which is based on the state common law. False imprisonment. And you allege that? Yes. And did the court rule on that, the district court? Yes. The court ruled, in essence, that since there was a facially valid warrant at the time of the arrest, the entire detention was lawful. And it's fully briefed in our brief how that is inconsistent with Oregon law. So really, we're dealing, there's distinctions between pretrial detainees under the 14th Amendment and convicted prisoners under the 8th Amendment. And those distinctions are recognized but not found to be important in Belle v. Woolfish by the Supreme Court and this court in Gibson v. County of Washoe. So we're looking at that distinction. Also, Belle v. Woolfish teaches us that if an action is arbitrary, if there's no valid peniological interest, then it's presumed punitive under the 14th Amendment. So that's the lens that we look at the conduct of Yamhill County and Mr. Shea's claims. First, a policy, practice, or custom on any of the three claims. The whole, that there's deposition testimony by the officer who placed Mr. Shea in the K-block, which is the most restrictive punishment cell in the prison, that said that it was the policy that if they ran out of the other classification cells, that whoever was last there was put in there, regardless of whether or not they're a detainee or a prisoner. That's arbitrary. They could easily take somebody that was brought into the prison earlier, convicted of a crime, place him in that cell, and take a non-convicted inmate and put him into the normal classification cell, in essence treating him like the other prisoners. That's an arbitrary distinction, and that's presumed punitive. Second point, medium security. Let's assume Mr. Shea was not an immigration detainee and that he was convicted of a minor crime and sentenced to Yamhill County. The policy of Yamhill County was to classify according to a form, and they take an individualized determination of Mr. Shea. Was he convicted of a violent crime? No. And they go down step by step by step to determine where in the prison he'll be housed. And the last thing is low security. Now, that's the policy relating to convicts. The policy relating to immigration detainees is that they get down to medium security, and bang, medium security. All we're asking for, and all that the Constitution demands, is that the pretrial detainees be treated at least as good as the prisoners. Otherwise, it's arbitrary and it's presumed punitive. That's all we're asking for the court to say, is that treat an INS detainee the same as a prisoner, give him an individualized consideration. If he's a convicted murderer, the INS detainee should go in high security. That's not the case here. Finally, on diet. There's an absolute constitutional right to an adequate diet. We presented evidence to the court of a registered dietitian saying that the diet was inadequate, would pose an imminent threat to his health. We have jail records, most of them. Miraculously, one page that would record weights is missing. So there's a presumption that that would be evidence favorable to Mr. Shea. But even the numbers that we have say he lost 13 pounds in six days on a diet that he complained about, and they ignored. Now, Yamhill County misstated the standard for the diet here. It's custom policy or practice. A doctor hired by the jail or the county, and a nurse hired by the county, can establish the custom of never increasing the caloric intake for a prisoner. Thank you. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for a decision by the court that completes our calendar for the week. This court is adjourned. All rise. This court's discussion stands adjourned. Thank you. Thank you.
judges: T.G. Nelson, Rawlinson, Pollak